In the Matter of CHARLES E. HUNTER, an Attorney.

Second Department, December 12, 1919.

**Attorney-at-law disbarred — conversion.**

Attorney-at-law disbarred for converting the money of a client received to be applied upon a mortgage and for falsely representing to the client that he had used the money for that purpose.

MOTION to confirm report of the official referee, in proceedings brought to discipline or punish Charles E. Hunter, an attorney, for professional misconduct, finding that said

Hunter is not qualified to continue in the practice of the profession.

*Mortimer W. Byers*, for the motion.

*Charles E. Hunter*, in person, opposed.

JAYCOX, J.:

This proceeding is brought to discipline or punish Charles E. Hunter, an attorney, for professional misconduct. Hunter has been practicing his profession for sixteen years. Complaint against him was first made to the Brooklyn Bar Association. Hunter was notified and made no reply. Later the complaint was made the subject of a hearing before the committee on grievances. Notice of the hearing was given to Hunter, who did not appear but asked that the hearing be adjourned. Pursuant to his request, the committee arranged for a hearing at a later date. Notice of this was given to Hunter, but he did not appear on the adjourned date but on that date telegraphed to the committee that he would file a written statement the following Thursday. No such statement was ever filed. Notice of this application was given to Hunter, but he defaulted in appearing or answering until after the matter had been referred to Hon. Edward B. Thomas to hear and report concerning the matters involved, with his recommendation. The matter has been fully heard and a report made finding that Hunter is not qualified to continue in the practice of the profession.

The complainant, Charles W. Juillerat, is in the employ of the Interborough Rapid Transit Company as a guard, and lives in the borough of The Bronx. He is the owner of the premises known as 1760 Walton avenue in that borough. These premises are subject to a mortgage for $5,500, which became due May 14, 1918. Prior to that date Juillerat saw Mr. Earle, who represented the mortgagee, and arranged for an extension of this mortgage, by the terms of which $100 was to be paid on account of the principal on its due date and $100 semi-annually thereafter, and Juillerat's father was to join in the bond. Mr. Juillerat then saw Hunter and explained the situation to him and told him he would like to avoid the payment on account of the principal and the signing of the

bond by his father. Hunter said he could arrange to have the payment on account of principal reduced to $50, that he could arrange the whole matter, and that the money for that purpose should be turned over to him. Accordingly, Juillerat gave him $212.50, this amount being made up as follows: Interest, $137.50; drawing extension agreement, $25; and $50 on account of principal. Hunter wrote to Earle and later called upon him. At the interview, May 6, 1918, Hunter sought to have the payments on account of principal reduced and Juillerat's father omitted from the bond. Earle consented to reduce the payments, after the first payment, to $50. The question of leaving the father out of the bond was not definitely decided. Juillerat claims that Hunter, soon after this, told him the money had been paid — everything was all right. He is supported in this contention by letters which Hunter wrote him. Hunter, however, had not paid the money to Earle, but commenced a systematic evasion of meeting him or doing anything to adjust the matter. To Juillerat he made representations that he had paid, and assurances that everything was all right; and on the other hand, to Earle he made promises to pay and excuses for not doing so. In the meantime he had the money and could keep it as long as his duplicity was not discovered. That this was the situation is made clear, not only by the oral testimony, but also by the letters of Hunter and Earle. At last Earle declined to wait longer and commenced a foreclosure action. Hunter still continued to assure Juillerat that everything was all right. Hunter now claims that these assurances related to obtaining a new mortgage from one Wheeler. Wheeler is clearly a mythical character. Jus at the time when he might be of some use to Hunter, he has disappeared. Hunter says he delayed putting in his answer in this proceeding to procure Wheeler's affidavit to accompany it. No affidavit was procured. Hunter, however, received a letter from him after this proceeding was instituted, but has destroyed it, and now Wheeler has disappeared and "left no trace." That Hunter *represented* to Juillerat that he was endeavoring to obtain a new mortgage I have no doubt. There is, however, such a paucity of detail about these negotiations that the testimony is very unconvincing. The fore-

Second Department, December, 1919. [Vol. 189.

closure took the usual course, no answer being interposed. A receiver of the rents was appointed. After the appointment of the receiver, Juillerat seemed for some time to rest content upon Hunter's assurances that everything was all right. Juillerat collected the rents for the month of August. Later, Juillerat apparently discovered that Hunter was guilty of double dealing and took the matter up with Earle without Hunter's intervention, and settled the foreclosure at an expense of $123.20.

Hunter still has the $212.50. He claims that he has offered it to Juillerat but Juillerat denies it, and I think his story is very much more probable. I cannot believe that Juillerat would borrow $500 on a second mortgage if he knew Hunter had nearly half of this amount in his possession which could be had for the asking. Juillerat claims that Hunter continued to represent that he had paid this money over to Earle and offered to show his check stub. The actions of the parties then and every bit of documentary evidence harmonizes with this contention. Hunter, on the other hand, claims that he did not pay the money over because Earle would not agree to the terms upon which it was to be paid over and that Juillerat knew all the time that Hunter had the money in his possession. At no time did Hunter write to Juillerat anything from which a deduction in harmony with this claim can be drawn, and at no time did Juillerat do or say anything consistent with that theory. Hunter says that he offered a check for the money to Juillerat, but a reading of the testimony does not lead to the conclusion that an offer was made. In any event, the offer rested in mere words and no check was prepared and tendered. No check has been sent to Juillerat and no money or check was produced before the referee and tendered as an evidence of honesty and good faith. I agree with the learned referee that this transaction shows that Hunter does not possess the qualifications to permit him to continue as a member of the profession. He lacks the first and basic principle which all members of the legal profession should possess — honesty. Without that, all other talents are useless, yes, worse than useless; they serve merely to lure people into placing their money and property in the custody and under the control of those with whom it is not safe.

I recommend that the report of the referee be confirmed and that the name of Charles E. Hunter be stricken from the roll of attorneys and that he be precluded from practicing as an attorney or counselor in the courts of record of this State.

JENKS, P. J., RICH, PUTNAM and BLACKMAR, JJ., concurred.

Report of referee confirmed and the respondent Charles E. Hunter disbarred.